**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| William Harris, | ) | C/A No. 8:08-CV-1675-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | **ORDER & OPINION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the magistrate judge's report and

recommendation, made in accordance with 28 U.S.C. § 636(b)(1)(B), that this court

affirm the decision of the Commissioner denying plaintiff's application for disability

insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI

of the Social Security Act, 42 U.S.C. § § 410-33, 1381-83. Plaintiff has filed written

objections to the report and recommendation. For the reasons set forth below, the court

adopts the magistrate judge's report and recommendation and affirms the

Commissioner's denial of benefits.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed applications for DIB and SSI benefits on March 7, 2005, and

February 23, 2005, respectively, alleging that he became unable to work on March 23,

2003. The applications were denied initially and on reconsideration by the Social

Security Administration. On March 17, 2006, plaintiff requested a hearing before an

1

administrative law judge (ALJ), who heard plaintiff's case on February 22, 2007.  On

May 11, 2007, the ALJ issued his decision in which he found that plaintiff was not under

a disability as defined in the Social Security Act.  In making his determination that

plaintiff is not entitled to benefits, the ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security
Act through December 31, 2008.

(2) The claimant has not engaged in substantial gainful activity since March
23, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*,
416.920(b) and 416.971 *et seq.*).

(3) The claimant has the following severe impairment: right arm pain due to
chronic tendonitis (20 CFR 404.1520(c) and 416.920(c)).

(4) The claimant does not have an impairment or combination of impairments
that meets or medically equals one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926).

(5) After careful consideration of the entire record, the undersigned finds that
the claimant has the residual functional capacity to perform light work with
sit/stand option at will, due to right ankle pain. He can lift up to 20 pounds
occasionally and 10 pounds frequently, using one upper extremity as a helper
only. He can sit for 2 hours and stand and/or walk for 6 hours each in an 8-
hour workday.

(6) The claimant is unable to perform any past relevant work (20 CFR
404.1565 and 416.965).

(7) The claimant was born on May 24, 1953, and was 50 years old, which is
defined as an individual closely approaching advanced age, on the alleged
disability onset date (20 CFR. 404.1563 and 416.963).

(8) The claimant has a limited education and is able to communicate in
English (20 CFR. 404.1564 and 416.964).

(9) Transferability of job skills is not an issue in this case because claimant's
past relevant work is unskilled (20 CFR 404.1568 and 416.968).

(10) Considering the claimant's age, education, work experience, and

residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR. 404.1560(c), 404.1566, 416.960(c) and 416.966).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from March 23, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The ALJ's decision became the final decision of the Commissioner when the Appeals Council approved the decision on February 22, 2008. Plaintiff then filed this action for judicial review, raising the following assertions of error:

I.  THE ADMINISTRATIVE LAW JUDGE (ALJ) ERRED IN FAILING TO FIND THAT PLAINTIFF'S OSTEOARTHRITIC CHANGES IN HIS RIGHT FOOT CONSTITUTED A SEVERE IMPAIRMENT.

II.  THE ALJ ERRED IN HIS FINDINGS REGARDING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

III.  THE ADMINISTRATIVE LAW JUDGE FAILED TO GIVE PROPER WEIGHT TO THE OPINIONS OF PLAINTIFF'S TREATING PHYSICIAN REGARDING THE NATURE AND SEVERITY OF HIS IMPAIRMENTS.

IV.  THE ALJ ERRED IN RELYING ON THE TESTIMONY OF THE VOCATIONAL EXPERT, AS THE HYPOTHETICAL HE POSED TO THE VE DID NOT INCLUDE ALL OF PLAINTIFF'S LIMITATIONS AS ESTABLISHED BY THE RECORD.

V.  THE ALJ'S DECISION IS NOT SUPPORTED BY COMPETENT SUBSTANTIAL EVIDENCE.

The magistrate judge rejected plaintiff's arguments and has recommended that the Commissioner's decision denying plaintiff benefits be affirmed. Plaintiff has filed specific objections to the magistrate judge's findings and conclusions regarding issues two and three, which this court will review de novo.

### B. Plaintiff's History

Plaintiff was fifty-three years old at the time of his hearing on February 22, 2007, with a ninth grade education and past relevant work experience as a longshoreman. Tr. 248-249. Plaintiff alleges that he became disabled due to an injury he sustained to his right arm on March 23, 2003. As of the date of his hearing, he also alleged disability as a result of the residual effects of an old fracture of his right foot. Tr. 21.

The medical evidence reflects that plaintiff sought treatment at the East Cooper Regional Hospital Emergency Room on March 23, 2003, after a co-worker dropped a two-and-a-half pound tie rod on his right arm. Tr. 80, 104-111. X-rays of his right forearm were negative for fractures; however, they revealed the presence of a bullet in the soft tissue medial to the shaft of the ulna. Tr. 109.

On March 26, 2003, plaintiff presented for additional treatment with Dr. Howard Brilliant of Parkwood Orthopaedic Clinic with complaints of right arm pain caused by his accident at work. Plaintiff's physical examination was positive for swollen tender right arm in the area of the biceps tendon and over the mid shaft of the radius. Repeat x-rays of the right arm showed no acute fractures or dislocations but again revealed the presence of the bullet, which had been lodged in plaintiff's arm for thirty years. Based upon his examination, Dr. Brilliant diagnosed plaintiff with a contusion of the right arm and advised him to remain out of work for three weeks but that he could return to work sooner if the pain subsided and he was able to use the arm. Tr. 223.

On May 16, 2003, Dr. Brilliant indicated that plaintiff was complaining of increasing pain and numbness in his right hand, and his examination was positive for

pain and tenderness over the anterior portion of the arm in the area of the anterior interosseous nerve. Tr. 219. Dr. Brilliant recommended EMG and nerve conduction studies which, according to his report of June 27, 2003, were negative for any nerve damage. Dr. Brilliant confirmed his previous diagnosis of right arm contusion with an old foreign body, and he advised plaintiff to return to work for thirty days and then return to his office for further evaluation. Tr. 218.

On July 17, 2003, plaintiff presented to Dr. Mark A. McLaughlin with complaints of nonexertional chest pain. Plaintiff told Dr. McLaughlin that he was able to do pushups and run a mile. Tr. 164. Plaintiff did not mention pain in his right arm.

On July 21, 2003, plaintiff presented to Dr. John R. Rowe and told him that he was unable to pull or tug the lines at work due to chest pain, but plaintiff did not mention pain in his right arm. Tr. 164. Plaintiff stated he could run without chest pain, but that pushups were painful. Tr. 164.

Dr. Brilliant next saw plaintiff on July 25, 2003, at which time he reported that he had reinjured his right arm with a tie rod at work one week earlier. Dr. Brilliant felt that plaintiff had a tear of the bracheoradialis muscle, and he again placed him on an out-of-work status. Tr. 215.

Upon examination on August 8, 2003 and September 8, 2003, plaintiff continued to exhibit swelling in his right arm, and he was prescribed Lidoderm patches at his September appointment. Tr. 211-213. Plaintiff continued to complain of severe right arm pain in October 2003, but examination by Dr. Brilliant revealed "minimal" swelling, good range of motion, and no obvious neurological deficits. Tr. 209.

On October 10, 2003, Dr. Brilliant addressed plaintiff's work status in a United States Department of Labor form entitled "Work Capacity Evaluation-Musculoskeletal Conditions." In this form, he indicated that plaintiff was unable to perform his job as a longshoreman, but that he was capable of working an eight hour workday provided that he had restrictions of lifting only ten pounds for two out of eight hours. Tr. 210. When plaintiff was seen on October 20, 2003, Dr. Brilliant prescribed ice, heat, and range of motion exercises, and he also referred him to Dr. Sheely for further evaluation. Tr. 209.

Although plaintiff was referred to Dr. Sheely, the record reflects that he was next seen by Dr. Jerrold Buckaloo of Palmetto Hand Surgery on December 3, 2003. Tr. 80. According to Dr. Buckaloo, plaintiff had full range of motion of the elbows, wrists and digits, but he noted increased circumference on inspection of the right forearm with tenderness to palpitation of the dorsal and volar compartments. Dr. Buckaloo reported that plaintiff exhibited a positive Phalen's, positive compression median nerve at the wrist, and a Tinel's from the level of the median nerve several centimeters distal to the bicep tendon to the level of the wrist crease. He also noted that plaintiff was experiencing pain and Tinel's type symptoms with compression over the median nerve at the site of compression for pronator's syndrome. Tr. 81. Based on these findings, Dr. Buckaloo recommended an MRI and CT scan of the forearm, as well as a repeat nerve conduction EMG study.

Pursuant to Dr. Buckaloo's recommendation, a CT scan performed at Tricounty Radiology Associates on December 22, 2003, showed ossification in the olecranon fossa of plaintiff's right arm, which was felt to reflect a retained metallic foreign body. Tr. 91.

Plaintiff also underwent the repeat EMG and nerve conduction studies ordered by Dr. Buckaloo. Tr. 75-76. On January 7, 2004, Dr. Buckaloo reported that plaintiff's diagnostic studies were essentially negative, and he recommended that he follow up with Dr. Brilliant for consideration of referral to occupational therapy, soft tissue massage, and a strengthening and work hardening program. Tr. 79.

Plaintiff returned to Dr. Brilliant on January 26, 2004, with complaints of continuing pain in his right forearm, and his examination was again positive for diffuse swelling and diffuse pain. Tr. 202. On February 19, 2004, Dr. Brilliant reported that plaintiff still exhibited a swollen painful right arm, and he also stated that plaintiff wanted to have the bullet removed. Dr. Brilliant recommended that plaintiff obtain a second opinion regarding removal of the bullet, and he was again advised to remain out of work. Tr. 200-01.

Per Dr. Brilliant's recommendation, plaintiff was seen by Dr. Christopher Litts at the MUSC Bone and Joint Center on March 23, 2004. Based on his examination, Dr. Litts reported that plaintiff appeared to be neurovasculary intact in his bilateral upper extremities but that he had tenderness over a palpable bullet just volar to his ulnar subcutaneous border of his wrist with mild swelling in this region. Dr. Litts opined that this was due to a facial defect caused by his old bullet wound, and he suggested that removal of the bullet might alleviate plaintiff's symptoms. Tr. 85.

Based upon Dr. Litts's recommendation, plaintiff underwent surgery at the Roper West Ashley Surgery Center on March 30, 2004, to remove the bullet in his right arm. Tr. 87. In a follow-up appointment on June 21, 2004, Dr. Brilliant reported that

plaintiff's wound had healed, but that he was still complaining of pain in his right arm. Tr. 193. On July 9, 2004, Dr. Brilliant recommended that plaintiff undergo an MRI of his right forearm due to his pain and swelling, and he was also prescribed Lortab to take as needed for pain. Tr. 190.

On July 26, 2004, Dr. Brilliant reported that plaintiff's MRI did not show any definitive surgical lesions or obvious abnormalities, and he stated that plaintiff had reached maximum medical improvement from the bullet removal and prior injury. Dr. Brilliant also indicated that plaintiff was released to return to work and that he should return in five to six weeks to reevaluate his condition. Tr. 189. Dr. Brilliant specifically noted that plaintiff "is not authorized to be out anymore from his work injury." Tr. 189.

The record reflects that plaintiff was next seen at East Cooper Emergency Room on August 9, 2004, for pain he developed in his right arm while pulling a lever at work. Tr. 92. He was referred to Dr. John McFadden at Charleston Hand Group, and when seen by this physician on August 11, 2004, he complained of recurrent pain and swelling in his right arm which had occurred when he had recently returned to work. Tr. 116-117. Plaintiff and his attorney requested that plaintiff be put on "no work" status, but Dr. McFadden found that a limited duty arrangement was appropriate because plaintiff "should be able to do some work with his arm." Tr. 116.

Dr. Brilliant next saw plaintiff on September 2, 2004. Plaintiff continued to complain of right arm pain and said he could not work. Dr. Brilliant noted he would wait on Dr. McFadden's report before taking further action. Tr. 187.

On September 16, 2004, Dr. McFadden indicated that the MRI plaintiff had

recently obtained showed evidence of inflammation in the bursa between the extensor carpi radialis brevis and the logus tendons, but that he was not a candidate for surgery. Dr. McFadden stated that he had no further treatment to offer plaintiff but would be happy to see him back on a PRN basis. Tr. 112.

Plaintiff was next seen by Dr. Brilliant on October 4, 2004, with continuing complaints of right arm pain, and his examination was positive for tenderness and swelling over the distal radius in the area where the tendons crossed the radius. Dr. Brilliant instructed plaintiff to return to work on October 11, 2004, but he was again placed out of work on October 20, 2004, when his examination was positive for "obvious swelling about the right dursum wrist and over the distal radius." Tr. 182, 185-86. Dr. Brilliant felt that plaintiff may have been developing reflex sympathetic dystrophy, and he referred him to physical therapy and prescribed Lidoderm patches. Tr. 182-84.

On November 29, 2004, plaintiff returned to Dr. Brilliant with continuing complaints of hand and arm pain, and his examination revealed limited range of motion in his right hand. Based on these findings, Dr. Brilliant recommended that plaintiff remain out of work. Tr. 179-80.

Plaintiff was next seen by Dr. Brilliant on January 10, 2005, at which time he was assessed as having reached maximum medical improvement and advised to return to work. Dr. Brilliant also assigned an eight percent impairment rating of the right arm secondary to his persisting complaints of pain and swelling. Tr. 177-78. However, when plaintiff returned to his office April 18, 2005, with continuing complaints of severe right wrist and arm pain, Dr. Brilliant stated that he was unable to work and that plaintiff had

"retired." Tr. 174.

During May 2005, plaintiff presented to Dr. G.T. Little for a disability evaluation. Tr. 142. Dr. Little found swelling of the right forearm and diffuse tenderness with a mild increase in heat. He stated that plaintiff's right forearm was half the size of his left forearm. Dr. Little opined that plaintiff could no longer work as a longshoreman and was "totally disabled." Tr. 142. That same month, state agency physician Jean V. Smolka reviewed plaintiff's file and found that plaintiff could lift up to fifty pounds occasionally and twenty-five pounds frequently and that he had an unlimited ability to push or pull. Tr. 144. Dr. Smolka found that, in an eight-hour day, plaintiff could stand and/or walk for a total of about six hours, and sit for a total of about six hours. Tr. 144. Dr. Smolka further found that plaintiff was limited in handling.[1] Tr. 146.

In addition to the medical treatment provided by Dr. Brilliant, plaintiff underwent a consultative examination by Dr. Daniel Bates of West Ashley Family Medicine on December 21, 2005. According to Dr. Bates, plaintiff complained of pain and weakness in his right arm from his injury in 2003 and pain and numbness in his right foot from his old injury in 1977. Dr. Bates reported that plaintiff's examination was negative for range of motion or strength deficits in his upper extremities, but that he exhibited some swelling and mild tenderness in his right forearm with grip strength reduced to 4/5 in the right upper extremity. Dr. Bates further indicated that plaintiff had a surgical scar on his right ankle but that his lower extremity examination was otherwise normal. Tr. 152-54.

Plaintiff next returned to Dr. Brilliant's office on June 19, 2006, about one year

---

[1] "Handling" is defined as "gross manipulation." Tr. 146.

after his previous appointment. Although Dr. Brilliant reported that plaintiff was still experiencing problems with his arm, he stated that plaintiff's major complaint was for increasing pain about his right foot from an old injury which was causing him to experience difficulty walking and standing. Tr. 172. Examination of plaintiff's upper extremities revealed no changes from previous exams, but Dr. Brilliant indicated that plaintiff had pain localized about his right ankle joint and mid foot. Based upon multiple x-ray views of his right foot, Dr. Brilliant reported plaintiff's ankle showed a healed old fracture of the distal tibia and minor arthritic changes in the tibia joint on the right, but with severe osteoarthritic changes and spontaneous fusion across the mid-foot joints. As a result of these findings, Dr. Brilliant advised plaintiff to avoid any strenuous activities, including long standing and walking, and he also gave him a handicap parking sticker. Tr. 172.

In addition to his treatment records, Dr. Brilliant completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on January 31, 2007. In this evaluation, Dr. Brilliant opined that plaintiff was limited to lifting ten pounds on an occasional basis with his right arm, and that he was only capable of standing for less than two hours in an eight-hour workday due to his old right foot injury. Dr. Brilliant further indicated that plaintiff was limited to pushing and pulling with both his upper and lower extremities due to his painful right arm and old foot injury, and he further restricted him to no climbing, balancing, kneeling, crouching, crawling or stooping. Dr. Brilliant also opined that plaintiff had limitations in his right hand with regard to reaching, handling, and fingering. Tr. 168-71.

At his hearing, plaintiff testified that he had experienced pain, swelling, and numbness in right arm on a continuous basis since his accident at work.  Tr. 250.  He testified that it was difficult for him to lift and carry objects heavier than a gallon of milk, and that he sometimes dropped things due to problems with his right hand.  Tr. 252-53.  Plaintiff also testified that he had been hospitalized after breaking a bone in his right foot many years earlier and that he was out of work for an extended period of time due to this injury.  Tr. 254-55.  He indicated that the problems with his foot had worsened over the years, and that he was currently experiencing significant foot pain as a result of this old injury.  He further testified that he was only able to stand for about fifteen minutes due to his foot injury and that it also prevented him from performing activities such as climbing or stooping.  Tr. 255-56.  Plaintiff also indicated that he spent most of his time at home sitting down watching television, and that he often propped up his foot on a pillow to ease his foot pain.  Tr. 256-57.

Vocational expert Arthur Schmidt testified in response to a series of hypothetical questions, one of which concerned an individual of plaintiff's age, education, and work experience who had the residual functional capacity to perform light work with the following limitations: sit and stand at will and use one upper extremity only as a helping hand.  Tr. 259.  The vocational expert testified that the hypothetical individual could perform the light jobs of carton packer (Dictionary of Occupational Titles ("DOT") 920.665-010, 275,000 jobs nationally and 3,055 in state), tobacco sampler (DOT 529.587-022, 10,600 jobs nationally and 118 in state), and storage facility clerk (DOT 295.367-026, 227,000 jobs nationally and 2,522 in state).  Tr. 259.  In response to a

question from plaintiff's counsel, the vocational expert testified that, as he observed

them, these jobs had sit/stand options.  Tr. 260.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the

magistrate judge's report to which a specific, written objection is made.  28 U.S.C. §

636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of

the magistrate judge.  See Thomas v. Arn, 474 U.S. 140 (1985).  This court is not

required to review, under a de novo standard, or any other standard, the factual findings

and legal conclusions of the magistrate judge to which the parties have not objected.  See

id. at 149-50.  A party's general objections are not sufficient to challenge a magistrate

judge's findings.  Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09

(6th Cir. 1991).  The recommendation of the magistrate judge carries no presumptive

weight, and the responsibility to make a final determination remains with this court.

Mathews v. Weber, 423 U.S. 261, 270 (1976).  This court may accept, reject, or modify

the report of the magistrate judge, in whole or in part, or may recommit the matter to him

with instructions for further consideration.  28 U.S.C. § 636(b)(1).

Although this court may review the magistrate judge's recommendation de novo,

judicial review of the Commissioner's final decision regarding disability benefits "is

limited to determining whether the findings of the [Commissioner] are supported by

substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907

F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion.  It consists of more than a mere scintilla of evidence

> but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

### III. DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520, 416.920. Under this process, the ALJ must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether that severe impairment meets or equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without considering vocational factors; (4) if not, whether the

impairment prevents him or her from performing past relevant work; and (5) if so, whether the claimant is able to perform other work considering both his remaining physical and mental capacities (defined as Residual Functional Capacity or "RFC") and his vocational capabilities (age, education, and past work experience) to adjust to a new job.  Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920).  The applicant bears the burden of production and proof during the first four steps of the inquiry.  Pass, 65 F.3d at 1203 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).  If the sequential evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant could perform.  Id.; see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (discussing burden of proof).

In this case, the ALJ found that plaintiff suffers from a severe impairment and is unable to perform past relevant work as a longshoreman.  Tr. 19, 23.  The ALJ then determined that plaintiff retains the residual functional capacity to perform jobs that exist in significant numbers in the national economy.  Tr. 23.  As a result, the ALJ concluded that plaintiff is not entitled to disability benefits.  Tr. 24.

## A. Treating Physician's Opinion

Plaintiff objects to the ALJ's assessment of the opinion of Dr. Brilliant, a treating physician.  Specifically, plaintiff maintains that the ALJ committed legal error by not adhering to the "treating physician rule" and Social Security Ruling 96-2p.  The court disagrees.

Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.  Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527).  Opinions of treating physicians occupy a special status.  "[T]he treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician."  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam); see also Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987) ("[The treating physician] rule requires that the opinion of a claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence."); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.1983) (same).  "A treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing 20 C.F.R. § 416.927).  "Thus, '[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'"  Id. (citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)).  "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  Id. (citing Hunter, 993 F.2d at 35).

The Code of Federal Regulations draws a distinction between a physician's medical opinions and his legal conclusions. "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), ... and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as "statement[s] by a medical source that [the claimant is] 'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(e)(1). While the ALJ must give a treating physician's medical opinions special weight in certain circumstances, the ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value. See 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to . . . [a treating physician's legal conclusions]. . . ."). The ALJ is not free, however, simply to ignore a treating physician's legal conclusions, but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." Social Security Ruling 96-5p.

Social Security Ruling 96-2p deals with giving controlling weight to treating source medical opinions and provides,

> 1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.
> 2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
> 3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.
> 4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent"

with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The ruling goes on to explain that,

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
When the determination or decision:
* is not fully favorable, e.g., is a denial; or
* is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
*the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight*. . . .

(emphasis added).

Here, the ALJ properly discounted Dr. Brilliant's opinion in the face of persuasive contradictory evidence. As an initial matter, the court notes that ALJ clearly did not give controlling weight to Dr. Brilliant's opinion given the ALJ's finding that "Dr. Brilliant's office notes fail to support his assessment of the claimant's limitations." Tr. 22. It is equally clear that, while the ALJ obviously discounted Dr. Brilliant's opinion, he did give some weight to Dr. Brilliant's findings. Specifically, the ALJ

implicitly adopted Dr. Brilliant's finding that plaintiff should not lift more than ten

pounds with his right arm and had limitations in pushing, pulling, reaching, and handling

with that arm when he found that plaintiff should only use his right arm as a helper.[2]  Tr.

20, 168-69.

The ALJ was clearly aware of the "treating physician rule," as he cited the

applicable law in his opinion.  He also cited to the persuasive contradictory evidence that

led him to discount Dr. Brilliant's opinion.  The ALJ observed that Dr. Brilliant

repeatedly released plaintiff to return to his medium-exertion job as a longshoreman,

most recently in January 2005.  Tr. 22, 177, 185, 189, 218, 223.  See Johnson v. Barnhart,

434 F.3d 650, 656 n.8 (4th Cir. 2005) (finding that substantial evidence supported a

finding that a treating physician's opinion was unreliable where, among other factors, the

treating physician previously stated that the claimant could perform light work and would

be a

good candidate for vocational rehabilitation); 20 C.F.R. § 404.1567(c) (observing that, if

someone can do medium work, he can also do light work).

---

[2]  On the other hand, the ALJ implicitly rejected Dr. Brilliant's findings of more severe restrictions.  Tr. 168-69.  Plaintiff argues that the ALJ erred under Social Security Ruling 96-2p by not being more specific about the precise weight he gave to Dr. Brilliant's opinion.  However, in relevant part, Social Security Ruling 96-2p only requires the ALJ's decision to contain "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and [the decision] must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  As already noted, it is clear to the court that the ALJ gave some weight to Dr. Brilliant's opinion, but not controlling weight.  Moreover, as discussed below, the ALJ recited the specific reasons for discounting Dr. Brilliant's opinion.  Accordingly, the ALJ did not run afoul of Social Security Ruling 96-2p.

Dr. McFadden also found that plaintiff could return to work, stating "he should be able to do some work with this arm." Tr. 116. Indeed, Dr. McFadden repeatedly stated that, considering the available medical evidence, it was difficult to explain why plaintiff continued to report severe pain in his right arm. Tr. 112, 114, 117. Dr. McFadden ultimately concluded that "there is no medical reason for why he is prevented from working other than his pain and the limitations that he states are the cause of this." Tr. 112.

Plaintiff returned to Dr. Brilliant in April 2005, but the doctor's notes do not indicate that he examined plaintiff on that date. Tr. 174. At that visit, plaintiff told Dr. Brilliant that he "retired" in January 2005, and asked the doctor to complete a disability form. Tr. 173-174. When Dr. Brilliant next examined plaintiff, in June 2006, he observed that plaintiff's arms were unchanged, and neurological testing failed to reveal any abnormalities. Tr. 22, 172. While x-rays revealed some arthritic changes in plaintiff's foot, Dr. Brilliant did not limit the total amount of time that plaintiff could stand each day. Tr. 172.

Moreover, the extreme limitations that Dr. Brilliant placed on plaintiff's ability to stand, walk, climb, balance, kneel, crouch, crawl, stoop and push or pull are also contradicted by plaintiff's own admissions about his abilities. In December 2005, plaintiff told Dr. Bates that he could walk for six hours and stand for four hours. Tr. 22, 152. Evidence in the record indicates that plaintiff did push-ups and ran and walked for exercise, drove and performed light housework. Tr. 152, 162, 164, 257. See Johnson, 434 F.3d at 656 n.8 (finding that substantial evidence supported a finding that a treating

physician's opinion was unreliable where, among other factors, the claimant's admissions regarding her activities contradicted the physician's assessment).

The objective medical evidence also fails to support the extreme limitations imposed by Dr. Brilliant. Medical tests and imaging (including tests and imaging ordered by Dr. Brilliant) consistently failed to show bone, soft tissue, or neurological abnormalities in plaintiff's right arm. Tr. 21, 77-79, 91, 103, 189, 218. In August 2004, Dr. McFadden observed that plaintiff had a full range of motion in both hands and wrists and normal sensation in his hands. He found no evidence of a Tinel's sign and noted a negative Watson test and LT shear test. Tr. 117. In February 2005, Dr. Rowe found no objective abnormalities in plaintiff's right arm, apart from some diffuse tenderness with palpation. Tr. 161. Similarly, in December 2005, Dr. Bates found that Plaintiff had normal muscle bulk, a full range of motion in all joints, full 5/5 strength in his arms and legs, good grip strength in his right hand, and a negative straight leg raise test. Tr. 22, 23, 153.

As noted above, this court's review is limited to whether the ALJ's findings are supported by substantial evidence and whether he applied the correct law. In deciding to discount Dr. Brilliant's opinion, the ALJ cited the correct law and followed it; therefore, he did not commit legal error. Moreover, his findings are supported by substantial evidence, and they must be affirmed.

**B. Residual Functional Capacity**

In his residual functional capacity finding, the ALJ determined that plaintiff could

perform light work but required a sit/stand option because of his right ankle pain.[3] According to plaintiff, the sit/stand option is not compatible with light work. The court disagrees.

In Walls v. Barnhart, 296 F.3d 287, 290-92 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit recognized that an ALJ can rely on a vocational expert's testimony about a claimant's ability to perform light work with a sit/stand option where the ALJ has consulted the expert about the implication of the sit/stand option on the occupational base. Here, the vocational expert testified that an individual with plaintiff's residual functional capacity—including a sit/stand option—could perform the light jobs of carton packer, tobacco sampler, and storage facility clerk. Tr. 259. The vocational expert specifically testified that he had personally observed these light jobs performed in a manner compatible with a sit/stand option. Tr. 260. Thus, the ALJ did not err when he concluded at step five of the sequential evaluation process that plaintiff could perform a substantial number of jobs existing in the national economy.

---

[3] The ALJ noted he was giving plaintiff "the benefit of the doubt" about his right ankle pain. Tr. 23.

# IV. CONCLUSION

For the foregoing reasons, the court **ADOPTS** the magistrate judge's report and

recommendation and **AFFIRMS** the Commissioner's decision denying benefits.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 17, 2010**
**Charleston, South Carolina**